355 F.2d 842
 122 U.S.App.D.C. 417
 DALLAS GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL
UNION NO. 745, INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Empire Terminal
Warehouse Co., Intervenor.
 No. 19265.
 United States Court of Appeals District of Columbia Circuit.
 Argued Cot. 11, 1965.
Decided Jan. 6, 1966.
 
 Mr. David R. Richards, Dallas, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Messrs. L.N.D. Wells, Jr., Dallas, Tex., and Herbert S. Thatcher, Washington, D.C., were on the brief, for petitioner. Mr. David S. Barr, Washington, D.C., also entered an appearance for petitioner.
 Mr. Hans J. Lehmann, Atty., N.L.R.B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., N.L.R.B., were on the brief, for respondent.
 Mr. Allen P. Schoolfield, Jr., Dallas, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Mr. J. Parker Connor, Washington, D.C., was on the brief, for intervenor.
 Before WILBUR K. MILLER, Senior Circuit Judge, and BURGER and TAMM, Circuit Judges.
 BURGER, Circuit Judge:
 
 
 1
 The issue under review is whether the National Labor Relations Board could properly find that an employer and a union had bargained to an impasse, thus warranting the employer in reducing wages unilaterally after termination of their existing contract.
 
 
 2
 Petitioner, a local union affiliated with the International Brotherhood of Teamsters, seeks review of an order of the Board dismissing a complaint arising from charges filed by Petitioner against Empire Terminal Warehouse Company, intervenor in this action. The issue under review grows out of an alleged violation by the Company of Section 8(a)(5) of the National Labor Relations Act, 61 Stat. 141 (1947), 29 U.S.C. 158 (1964), making it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees.
 
 
 3
 The Union charged that the employer had breached his bargaining duty by instituting a wage reduction while negotiations were pending and then no impasse had developed. The Trial Examiner dismissed the complaint on the grounds that impasse in negotiations was not necessary for such a unilateral action, also finding that there was no impasse at the time the action was taken. The Board upheld the dismissal, but concluded that the record showed an impasse had been reached. It did not, therefore, reach the question of whether a wage cut by the employer is permissible absent an impasse.
 
 
 4
 The only question before us is whether there was sufficient basis in the record for the Board's finding that an impasse had been reached. There is little dispute as to the actual history of the negotiations; the parties differ only on the Board's conclusion as to whether the status of bargaining constituted an impasse.
 
 
 5
 Prior to the negotiations under review the Union and the employer had had amicable collective bargaining relations beginning in 1956. With their contract due to expire on August 16, 1962, they began negotiations on July 13. The Union presented a complete proposed contract including significant changes in contract terms and a 25 cents hourly wage increase. At the second meeting, July 24, the Company presented a detailed counterporposal on all issues except wages, and pointed out that it was allready paying 35 to 50 cents more per hour than its competitors, and could hire men in the area for less then the existing Union rate. The Union asserted it would not sign any contract without a wage increase. At a later meeting the Company asked the Union for a new wage proposal and the Union replied that it thought the next move was up to the Company. On August 6 the Union indicated it would ask its membership if they would forego the 25cents increase. At this point a representative of the Federal Mediation and Conciliation Service was called in and participated in meetings held after August 6, 1962. Before the Union could meet, the Company wrote the Union that its 'wage proposal in the negotiations for a new contract' was a reduction of 40cents for new workers and 55cents for existing ones and that it would put this reduction into effect on August 17, after the expiration of the contract. On August 13 the union membership voted to strike if a wage cut was made. On the day of contract expiration, August 16, the Union proposed an extension of the current contract. The Company rejected this, and the Union then proposed a new contract with a cut in the wage rate for new workers and the same rate as in the current contract for existing workers; the Company rejected this. At this point, the testimony indicates, no future meeting was scheduled but it was agreed that if either party wanted to meet again they could schedule another session 'when the spirit moved them.' The next day the Company put its reduction into effect.
 
 
 6
 The Board found that an impasse had been reached before the Company reduced wages. While the Board inaccurately recited that the Union was still demanding a wage increase at the time negotiations terminated, the record indicates no Union intention to recede from its position that there should be no wage cut for existing employees, who were the immediate concern, nor is there any suggestion that the Company had any intention of receding from its position on a wage reduction. At no time did the Company refuse to meet; a week or more after the wage reduction became effective and after the contract expired, it wrote the Union stating its continued willingness to meet. But the Union then called for a second strike vote and a strike began on September 10 with most of the employees participating. All striking employees were replaced placed by September 12; the record does not reveal at what rates the replacements were employed. Thereafter meetings were held on September 24 and 27, October 3 and 12.
 
 
 7
 Our evaluation of the Board's finding that the Company did not refuse to bargain in good faith depends, as we suggested, on whether there is a record basis for the finding that at the time of the wage reduction the parties had reached an impasse in wage negotiations. It is elementary that firmness of a bargaining position does not constitute had faith. Our scope of review confines us to determining whether there is an absence of substantial evidence to support the Board's finding; impasse is a question of fact involving the Board's presumed expert experience and knowledge of bargaining problems. The problem of deciding when further bargaining on an issue is futile is often difficult for the bargainers and is necessarily so for the Board. But in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.
 
 
 8
 Where good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock, the Board is warranted, see American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), and pershaps sometimes even required, cf. N.L.R.B. v. Intracoastal Terminal, Inc., 286 F.2d 954 (5th Cir. 1961), to make a determination that an impasse existed.
 
 
 9
 There is no fixed definition of an impasse or deadlock which can be applied mechanically to all factual situations which arise in the field of industrial bargaining. Nor is there a rigid formula for assessing so subtle an issue as the precise time when an impasse occurs; but the fact that the parties resume discussions on issues other than wages after the date of the wage cut is not incompatible with a finding that an impasse on the wage issue had been reached by that date.[1]
 
 
 10
 The claim that the Board erred in refusing to order the Company to reveal its financial position is not well founded. The Company's position on wages was not based on a claim of financial inability to pay but on the ground that it was paying rates in excess of prevailing rates of its competition in the same labor market.
 
 
 11
 Affirmed.
 
 
 
 [1]
 The only subsequent reference to the wage issue was the Union's renewal and the Company's rejection on October 12 of a proposal for a renewal contract at the existing rates with a raise six months later. We do not reach the question of whether evidence of renewed discussion of wages would preclude a Board finding of impasse