INTERNATIONAL WOODWORKERS OF AMERICA, AFL–CIO, LO-CAL 3–10, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Long Lake Lumber Company, Intervenor.

No. 24390.

United States Court of Appeals, District of Columbia Circuit.

Argued May 28, 1971.

Decided Jan. 18, 1972.

Mr. John Silard, Washington, D. C., with whom Mr. Joseph L. Rauh, Jr., Washington, D. C., was on the brief, for petitioner.

Mr. Jack Wiener, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Washington, D. C., at the time the brief was filed, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Leonard M. Wagman, Atty., National Labor Relations Board, were on the brief, for respondent.

Mr. George J. Tichy, Spokane, Wash., for intervenor.

Before BAZELON, Chief Judge, and McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

In this statutory review proceeding under the National Labor Relations Act, 29 U.S.C. § 151 et seq., the petitioning union asks us to overturn a decision by the National Labor Relations Board that the intervenor employer did not violate Section 8(a) (5) of the Act by failing to bargain collectively in good faith. The facts are not in dispute and were mainly stipulated before the Board. The controversy relates to the inferences rationally to be drawn from them in terms of the employer's purposes.

The union asserts those purposes were to resist the reaching of any agreement except one which would unacceptably and illegally have deprived it of its statutory right to prior notice and bargaining about changes materially affecting wages, hours, and working conditions. The employer, contrarily, insists that it sought only to engage in serious negotiations about the scope of a management rights clause proposed by it for inclusion in the agreement.

■ We define our limited role in the resolution of this matter against the background of two established propositions. One is that it has been clear, at least since the Supreme Court's decision in NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), that an employer proposal of a management functions clause for inclusion in a labor contract is not, *"per se,* an unfair labor practice." [1]

---

1. The Act makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees. Section, 8(d), in its relevant

As the Court went on to say in that case (at p. 409, 72 S.Ct. at p. 832):

". . . Any fears the Board may entertain that use of management functions clauses will lead to evasion of an employer's duty to bargain collectively as to 'rates of pay, wages, hours and conditions of employment' do not justify condemning all bargaining for management functions clauses covering any 'condition of employment' as *per se* violations of the Act. The duty to bargain collectively is to be enforced by application of the good faith bargaining standards of Section 8(d) to the facts of each case rather than by prohibiting all employers in every industry from bargaining for management functions clauses altogether."

■ The other is the repeated recognition by the courts that the drawing of inferences as to good or bad faith in the bargaining process is "largely a matter for the Board's expertise" brought to bear on the particular facts before it. Fruit & Vegetable Packers and Warehousemen, Local 760 v. NLRB, 114 U.S. App.D.C. 388, 389–390, 316 F.2d 389, 390–391 (1963); and *see* Retail Clerks Union No. 1550 v. NLRB, 117 U.S.App. D.C. 336, 342, n. 5, 330 F.2d 210, 216, n. 5 (1964), cert. denied, 379 U.S. 828, 85 S.Ct. 41, 13 L.Ed.2d 31 (1964). As we said in Dallas General Drivers, Warehousemen and Helpers Local Union No.

745 v. NLRB, 122 U.S.App.D.C. 417, 419–420, 355 F.2d 842, 844–845 (1966), ". . . in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems." The Board's determination that an employer has lived up to its Section 8(d) responsibilities will not be judicially disturbed except as it may appear to us "irrational or unsupported by substantial evidence." Oil, Chemical & Atomic Workers Intern. Union, Local 4–243 v. NLRB, 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (1966).

I

The lengthy bargaining negotiations in this case, both before and after the strike and the filing of the unfair labor practice charge, are described at length in the Board's decision and need not be repeated here in all their detail.[2] After 30 years of successful bargaining relationships between petitioner and the employer, difficulties were encountered at the time of the expiration of the latest agreement on June 1, 1966. These related to the wage demands of petitioner, on the one hand, and to proposals by the employer with respect to the anniversary date of the contract, its duration, and the inclusion in it, for the first time, of a comprehensive management functions clause.[3]

---

part, defines this bargaining obligation in these terms:

". . . to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer *in good faith* with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . ." (Emphasis supplied.)

29 U.S.C. § 158(d).

2. The negotiations extended over a period of more than two years—from May 5, 1966 until June 26, 1968—and involved 20 formal bargaining sessions, as well as numerous informal discussions and much correspondence. The strike began on July 18, 1966.

3. The understanding between the parties was that all of the terms of the expiring contract would continue in the new except for those as to which changes were proposed. Left untouched by any such proposals were provisions for a union shop, Monday through Friday work schedules for production workers, fringe benefits, and similar matters of substance in the employment relationship, including a grievance procedure. Under this last,

The reasons given by the employer for seeking a management clause were three in number, all deriving from recent events. First, the union in 1962 had delivered to the employer a resolution insisting that the production manager be dismissed. Second, three years later the union had filed an unfair labor practice charge with the Board challenging the employer's assumption that, in the absence of a controlling provision in the contract, it had a managerial right to rearrange the work schedules of maintenance employees.[4] Third, the employer had had to abandon this assumption in the wake of recent Board and court decisions, and now understood that, if it was to retain managerial rights in respect of a variety of matters, it must spell out that retention in the collective bargaining agreement.

The management clause initially proposed by the employer is set out in the margin.[5] The employer represented to the union that it was not finally committed to the language or to any of the particular items in that clause, and that it was prepared to negotiate with respect to the elimination of any one or more of such items. It also declared that any action taken by it under such a clause could be treated as a grievance which, after exhaustion of the grievance machinery,

---

grievances were defined as "all disputes, grievances, or complaints arising out of or under the contract's terms;" and unsuccessful invocation and exhaustion of the grievance procedures left the union explicitly free to strike.

4. This incident gave rise to our decision in International Woodworkers of America, AFL–CIO Local 3–10 v. NLRB, 127 U.S.App.D.C. 81, 380 F.2d 628 (1967), which involved the same parties. There the employer, in order to promote the efficiency of plant maintenance, varied unilaterally the work week of one of the maintenance employees so that his five-day week included Saturday and Sunday without overtime pay. Because the existing agreement was silent on this point and reserved no such right to the employer, we held that the employer had violated its bargaining obligation with respect to working conditions.

Contrary to the suggestion now made to us by the union, our holding in that case does not govern the issue in this. We there pointed out that "[t]he 1963–1966 contract contained no management-prerogative clause that might conceivably embrace (the right in dispute)." Id. at 630.

5. Except to the extent expressly abridged by a specific provision of this Agreement, the Company reserves and retains, solely and exclusively, all of its Common Law rights to manage the business, as such rights existed prior to the execution of this or any other previous agreement with the Union or any other union. The sole and exclusive rights of management which are not abridged by this Agreement, shall include but are not limited to its right to determine the existence or non-existence of facts which are the basis of a management decision to determine prices of products, volume of production and methods of financing, to drop a product line, to sell or lease the business, or any part thereof, free of the liabilities of this Agreement, to establish or continue policies, practices and procedures for the conduct of the business and, from time to time, to change or abolish such policies, practices or procedures; the right to determine and from time to time redetermine, the number, location, and relocation and types of its operations, and the methods, processes, and materials to be employed; to discontinue processes or operations or to discontinue their performance by employees of the Company; to determine the number of hours per day or per week operations shall be carried on; to select and to determine the number and types of employees required; to assign work to such employees in accordance with the requirements determined by management; to establish and change work schedules and assignments; to transfer, promote, or demote employees, or to lay off, terminate, or otherwise relieve employees from duty for lack of work or other legitimate reasons, to determine the fact of lack of work, to make and enforce reasonable rules for the maintenance of discipline; to suspend, discharge or otherwise discipline employees for cause and otherwise to take such measures as management may determine to be necessary for the orderly, efficient and profitable operations of its business—all to the best regard of its employees and the welfare of the operation.

could be made the basis of a lawful strike.

The union's initial response was to rule out flatly the inclusion of any management clause whatsoever, no matter what its particular terms might be. Further, the union firmly rejected any change in the June 1 anniversary date of the contract.[6] The union's wage proposal was for an increase of 55¢ an hour over a contract of three years' duration. The employer's first wage offer was 16¢ an hour for a one-year contract. Under a strike threat, this was increased to 21¢, but this was unavailing and the strike started July 18, 1966.

Negotiations continued, and a federal mediator eventually came in. The employer enlarged its wage offer to 33½¢ for a contract term longer than one year but shorter than two; and it also moved away from October 1 as its proposed anniversary date. The union came back with an offer of (1) a two-year contract ending June 1, 1968, with a 22¢ increase the first year and 12½¢ the second, or (2) a contract ending April 1, 1968, with an increase of 34½¢. These proposals were, however, conditioned upon a complete abandonment by the employer of its request for a management clause. The employer turned this down, and eventually began to hire permanent replacements for the striking workers.

In April of 1967, the union offered to accept a management clause phrased as follows:

Except as specifically limited by express provisions of this agreement, all rights, power and authority customarily exercised by management in the direction of the work force and the operation of the business are retained by the Company.

This offer was, however, made contingent upon the employer's agreement to (1) an increase of 55¢ over two years with a contract ending May 31, 1968, (2) immediate reinstatement of all striking union members, even if this meant dismissing employees working as replacements, and (3) a payment of $20 to each worker so reinstated. The employer rejected these conditions, and characterized the suggested management clause as "fine as far as it went," but as being deficient in not identifying more specifically some of the rights which it would preserve for the employer.

A new union spokesman appeared on the scene at a bargaining session on July 21, 1967; and he observed that he considered the parties to be hung up on three issues, i. e., management rights, contract term, and anniversary date. The union made a move on the first of these a few weeks later when it renewed its offer of a management rights clause, but this time with a specification that one of such rights would be the determination of the work schedule of maintenance employees. This was coupled to (1) a wage demand not much below the union's last proposal, payable under a 20-months' contract terminating February 1, 1968, and (2) the claim for immediate reinstatement of all strikers. The employer responded with a small increase in its wage offer, and a suggested termination date of October 1, 1968. It again said that the management rights proposal was a useful step forward, but continued to prefer the more specific language of its proposal as compared with the generalized language suggested by the union. The union then withdrew all its prior offers.

When meetings resumed on December 5, 1967, the employer asserted that "it

6. The significance of this date lay in the fact that a large number of employers in the lumber industry had the same contract anniversary date. The employer believed that this operated to put pressure on it to pay the same wages as emerged from the union's negotiations with larger and more diversified companies, better able to withstand the rigors of the current depressed state of the fabricated lumber industry. Although the employer initially proposed a contract date of October 1, throughout the bargaining it represented that there was no magic about this date, its interest being only in getting a date which would be somewhat removed from June 1.

would like the Union to spell out in the contract all of the rights it wanted to protect or in which it had an interest," leaving matters not so specified to be within the employer's province; and it represented that, if the union, as part of the bargaining over such a clause, wished to open up other provisions of the contract thus far regarded as closed, it would not object.[7] On June 26, 1968, four days before the hearing on the unfair labor practice charge, the parties appeared to have reached agreement on a number of issues, but were still apart on (1) the reinstatement of strikers, and (2) the spelling out of illustrative examples of management rights. The union then broke off the negotiations permanently.

The Trial Examiner found from the foregoing that the employer was "at all times determined not to reach an agreement with the Union." He professed to discover this bad faith in the scope of the management rights clause proposed by the employer, which he considered to be so broad as to demonstrate an implacable purpose "to rid itself of the obligation to bargain with the Union during the term of the contract."

The Board drew a different inference as to the employer's good faith from the stipulated facts. It noted the General Counsel's concession that, except for the management clause proposal, he made no claim that "any particular position or act of [the employer] was in derogation of its good-faith bargaining obligations." The Board also stressed the fact that the employer "was willing to agree, as it had in the past, to have embodied in a written contract a comprehensive code governing the employees' wages, hours, and conditions of employment, and at no time sought to foreclose or impede the Union from bargaining about any specific provision the Union might wish to have added thereto."[8] It concluded that

7. On June 21, 1968, the employer submitted a revised management clause in the following form:

MANAGEMENT RIGHTS

A. The Union has the rights which are specifically spelled out in this Agreement as well as such rights as are given it by statute unless these rights are limited by any provision of this Agreement.

B. All rights customarily and traditionally exercised by the Company to operate its business and direct its employees are hereby expressly reserved by and to the Company unless the terms of this Agreement specifically limit said rights, in which event the terms of this Agreement shall control. Except to the extent specifically limited by some other terms of this Agreement, these rights include, but are not limited to, the right to determine prices of products, volume of production and methods of financing, to drop or add a product line, to sell, merge, consolidate or lease the business, or any part thereof, free of the liabilities of this Agreement, to establish, revise or continue policies, practices and procedures for the conduct of the business, and from time to time, to change or abolish such policies, practices or procedures; the right to determine and from time to time redetermine, the number, location, relocation and types of its operations, and the methods, processes and materials to be employed; to discontinue processes or operations or to discontinue their performance by employees of the Company and/or to subcontract same; to. determine the number of hours per day and per week operations shall be carried on; to select and assign work to such employees in accordance with the requirements determined by management; to determine the existence or the lack of work; to make and enforce reasonable rules for the maintenance of discipline or efficiency; to suspend, discharge or otherwise discipline employees; and to take such measures as management may determine to be necessary for the orderly, efficient and profitable operation of its business—all to the best regard of its employees and the welfare of the operation.

C. It is also understood and agreed that the foregoing provisions shall in no manner prevent the utilization of the grievance procedure as provided in Article 2 of this Agreement.

8. The Examiner had relied heavily upon an earlier Board decision in Stuart Radiator Core Mfg. Co., 173 NLRB No. 17. The Board distinguished that case not only as involving a more sweeping reservation of management rights, but also because the company proposal put the union under a rigorous no-strike obligation with respect

"[f]rom our own review of [the employer's] bargaining conduct, particularly when considered in the light of its 30-year history of contractual relations with the Union, we find no adequate basis for concluding that because [the employer] pressed hard for its management rights clauses its aim must have been to avoid reaching agreement with the Union."

II

■ We deal, thus, not with disputes of fact, but only with the rationality of inferences, drawn from undisputed facts, as to motivation. The Board conceived this issue to be one falling within the Supreme Court's formulation in *American National Insurance, supra*, namely, the employer's bargaining obligation "is to be enforced by application of the good faith bargaining standards of Section 8(d) *to the facts of each case* rather than by prohibiting all employers in every industry from bargaining for management functions clauses altogether." (Emphasis supplied.) We so conceiver it as well; and we approach its resolution

with due regard for earlier judicial admonitions that the inferences drawn by the Board in this area of good faith are not lightly to be overturned.

The union asserts that the Board erred in taking the *American National Insurance* formulation as its point of departure. Its argument in this respect is, however, largely cast in terms of an insistence that the facts in that case were wholly unlike those presented by this record. Even if that be entirely true, the Supreme Court's analysis of the nature of the issue to be resolved, and the standard to be applied in its resolution, would remain untouched, for that analysis was explicit in its prescription of good faith as the touchstone to be applied "to the facts of each case" as distinct from "prohibiting all employers in every industry from bargaining for management functions clauses altogether." [9] We are not persuaded, as the union would have us believe, that *American National Insurance* has little significance for the law of bargaining on management rights proposals beyond the single area of the scope of compulsory arbitration. [10]

to any actions taken by management under the clause. The Board pointed out, in this latter regard, that the proposal in the present case explicitly left the employees free to complain about any action taken by the employer under the management clause and to pursue the grievance procedures long provided in the contract, with the ultimate right to strike if this was unsuccessful. The Board also noted that the record in *Stuart* contained evidence, independent of the proposal itself, of the employer's "bad faith approach to its statutory duty to bargain with the employees' representative."

9. In *American National Insurance*, a union newly certified as the bargaining representative proposed for the first contract a broad arbitration clause for all contract grievances. The Company responded to this demand with a counterproposal:

"The right to select and hire, to promote to a better position, to discharge, demote or discipline for cause, and to maintain discipline and efficiency of employees and to determine the schedules of work is recognized by both union and company as the proper responsibility and prerogative of management to

be held and exercised by the company, and while [company decision in these areas are reviewable under the grievance machinery], it is further agreed that the final decision of the company . . shall not be further reviewable by arbitration."

The Supreme Court rejected the Board's position that the company's insistence upon this clause was a *per se* violation of its bargaining obligation, and it refused to declare that insistence under the circumstances of that case to be in conflict with the statutory bargaining obligation.

We note in passing that the subjects sought to be reserved for final company decision in *American National Insurance* are among those included by the employer in the case before us in its management rights proposal.

10. *See*, Rabin, Fibreboard and the Termination of Bargaining Union Work: The Search for Standards in Defining the Scope of the Duty to Bargain, 71 Colum. L.Rev. 803, 834, n. 141 (1971). The author there notes that *American National Insurance* establishes the proposition that "[a]n employer is not subject

It is the union's submission to us that it is not *American National Insurance* that provides our rule for decision, but NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). It correctly characterizes that case in general terms as holding that an employer violates its bargaining obligations if it insists upon a waiver by the union of its bargaining rights. In *Borg-Warner*, however, that principle was articulated in the context of an employer's adamant demand for (1) a ballot clause calling for a pre-strike secret vote of both union and nonunion employees on the employer's last offer, and (2) a provision which enabled the employer to recognize only a union local, as distinct from the certified international, as the bargaining representative. These clauses, said the Supreme Court, did not relate to terms and conditions of employment and were not, accordingly, mandatory subjects of bargaining.

The union urges the relevance of *Borg-Warner* by pointing to certain rights included in the employer's proposed management clause. It caps this recital by saying in its brief that "[i]ndeed, in the final version of the Company's management rights clause . . . it even demanded the unqualified right 'to suspend, discharge or otherwise discipline employees . . .'"—a right which, we remark, is the exact equivalent of one which the employer in *American National Insurance* proposed to reserve for itself alone.

The other instances of deprivation of statutory bargaining rights asserted by the union in its brief as involved in the employer's proposal are:

1. The right to fix working hours.
2. The right to subcontract work, citing Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).
3. The right to sell the entire business free of the collective bargaining agreement.

■ These are, of course, mandatory bargaining subjects, but that does not mean that an employer may not seek in good faith bargaining to reserve them by agreement in a management rights clause. In this very case, the union eventually professed its willingness to agree that the hours of work of maintenance employees could be unilaterally determined by the employer. *Fibreboard* certainly made the subcontracting of work a mandatory bargaining subject, but many bargaining negotiations have resulted in the inclusion of this right in management clauses.[11] There would similarly be no prohibition upon a union's making such an agreement with respect to sale of the business free of the bargaining agreement if it chose to do so. The mere fact that a subject is an appropriate one for collective bargaining does not mean that the employer may not seek by agreement to reserve the matter to itself. The importance to the union of the right to future bargaining on such subjects can on occasion diminish in proportion to the other inducements which an employer may offer for its relinquishment.

It may well be that some one or more of the specific rights included in the employer's unquestionably broad proposal would, if they became the sticking point at which negotiations broke down, expose the employer to the charge of having been motivated by a bad faith purpose to reach no agreement at all. But whether such a purpose exists, however, is to be divined from the facts of each case—and the nature of a party's opening proposals is only one of such facts. Others include the climate and the course of the bargaining negotiations as a whole. The employer here, at the

---

to a statutory duty to bargain over those matters reserved to it under the collective bargaining agreement." The author also notes that a BNA study in 1970 discloses that management rights clauses appear in 68 per cent of all collective bargaining agreements.

11. Rabin, *supra* note 10, at 834:
"Contractual reservations of the right to subcontract are quite common . . ."

beginning of the bargaining and repeatedly thereafter, invited the union to designate those items in its management proposals to which it excepted, and emphasized that it was prepared to consider the elimination of any of the enumerated rights, as well as the inclusion of any express reservations of union rights deemed important by the union.

So far as the record shows, that invitation was never accepted, and the employer was, with one exception, met only, first, with an insistence that there be no management rights clause whatsoever, and, belatedly, by an offer of a bob-tailed clause so general in its terms as to be almost certainly, as the employer plausibly asserted, the source of misconception and conflict throughout the life of the contract. The exception, curiously enough, was the union's sudden expression of willingness, late in the negotiations, to agree to the inclusion in a management clause of a right in the employer to determine the working hours of the maintenance employees—the matter which gave rise to our earlier decision, Note 3 *supra*, and which is enumerated by the union in its brief invoking *Borg-Warner* as one of the mandatory bargaining subjects which the employer was illegally proposing to take off the bargaining table.

A union can, of course, agree to anything it wants to in the way of management rights as part of the bargaining process; and it may, accordingly, expect to receive proposals in that regard. We have no doubt that a union can be confronted with management rights proposals under bargaining circumstances which point unmistakably towards a company purpose to frustrate the achievement of a contract.[12] The question before us is whether the Board's finding of no such purpose on the employer's part on this record is belied by what that record reveals with respect to the bargaining relationships and negotiating exchanges of these parties.

The Board was, we think, amply supported in its conclusion by the long history of the living together of this employer and this union—a relationship which appears to have become seriously clouded only by the former's concern about being able to continue to exercise what it conceived to be its management functions. This concern prompted it to seek through bargaining an agreed statement of those rights. Its proposals were, as we have stated, undeniably broad, as indeed opening offers have a way of being until they have been refined through point-by-point discussion and negotiation. But this breadth was accompanied by a willingness to bargain about any aspect of the proposed clause—and this always in a context where agreement had been reached, and proposals and counter-proposals were being made, with respect to other important bargaining subjects.

We do not find in all this, any more than did the Board, a patent purpose on the employer's part to destroy the union and to drive it from its plant. Certainly we are without warrant, having due regard for our role in relation to the Board's, to set its determination at naught.

The petition for review is
Denied.

12. The Board, as the union reminds us, sustained an Examiner's finding to this effect in Florida Machine & Foundry Company, 174 N.L.R.B. No. 170 (1969). There, however, a broad management rights proposal was unaccompanied by any representation of willingness to consider changes or deletions suggested by the union, or any appeal to the union to submit counterproposals of its own. Moreover, the employer there flatly ruled out both arbitration and handling as a grievance. It also insisted upon a no-strike commitment.