NATIONAL LABOR RELATIONS
BOARD, Respondent.

Teamsters Local Union No.
293, Intervenor.

No. 00–1356.

TRUSERV CORPORATION, *f/k/a*
Cotter & Company,
Petitioner,

v.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 2001.

Decided July 6, 2001.

As Amended on Grant of Rehearing
Aug. 17, 2001.

Frank W. Buck argued the cause for petitioner. On the briefs were Mark V. Webber and Kenneth D. Schwartz. Kathy B. Houlihan entered an appearance.

Usha Dheenan, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Charles Donnelly, Supervisory Attorney.

Basil William Mangano and John M. Masters were on the brief for intervenor Teamsters Local Union No. 293.

Before: HARRY T. EDWARDS, Chief Judge, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

TruServ Corporation (formerly Cotter & Co.) petitions for review of a decision and order by the National Labor Relations Board. *See Cotter & Co.*, 331 N.L.R.B. No. 94 (July 19, 2000). TruServ challenges for lack of substantial evidence the Board's findings that it violated § 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1998), when it implemented terms and conditions of employment prior to reaching a genuine bargaining impasse, disciplined unit employees pursuant to unilaterally implemented work rules, and refused to process employee grievances. TruServ also seeks reversal or modification of the Board's remedial order, which it maintains appears to be punitive because the order would provide a windfall to the Union's health fund for healthcare claims paid by the company. We grant the petition on the issue of impasse because the Board's findings on that issue are not supported by substantial evidence; hence we do not reach TruServ's alternative contention that the Union had waived the right to bargain on work rules. We deny the petition's challenge to the processing of grievances.

## I.

TruServ Corporation manufactures and distributes hardware to various True Value Hardware stores. Teamsters Local 293 is the bargaining representative for the warehouse unit employees at the Company's Westlake facility.[1] A collective bargaining agreement, effective September 1, 1991, was due to expire on August 31, 1995. On July 20, 1995, the Company and the Union began negotiating for a successor bargaining agreement. At the outset, the Company expressed its concerns with the facility's efficiency and productivity, namely, that sales from the Westlake facility had decreased at a higher rate than sales for the Company as a whole, and that errors in filling orders at the Westlake facility had increased significantly.[2] After the Company's opening statement, the Union submitted a complete contract proposal on both economic and non-economic issues. Consistent with its past negotiations with the Union, the Company deferred discussion of "economic" (wages) issues until the end of the negotiations period, and on July 21, the parties agreed on a three-year

---

1. The warehouse unit includes order fillers, stock employees, shippers, receivers, certain maintenance positions, and a janitor.

2. According to testimony before the Administrative Law Judge, the Company anticipated that negotiations would be particularly difficult because the Company sought significant changes to address its concerns with efficiency and productivity; consequently, the Company asked to commence negotiations earlier than usual. The Company believed that it needed to expand the work week (thereby minimizing overtime) and to change the holiday schedule in order to respond to its members' demands for faster turnaround on orders. This was necessary because the Company's members, if dissatisfied, could buy products from another supplier. The Company also expressed concern about rising health care costs and sought to make its own health care program available. Prior to the commencement of negotiations, the Company set a "bottom line" for wage increases, opposing a large pay increase in part because of employees' sub-standard performance.

term for the new agreement and on language for the employee grievance procedure. During the eight days of negotiations,[3] the key issues discussed were (1) holidays, (2) the workweek, workday schedule, (3) healthcare, and (4) wages.

**A. Holidays.** The Company initially proposed to convert certain contractual holidays (especially the day after Thanksgiving) to "personal days," which the employees could use at other times, so that the warehouse could remain open to process the high volume of orders. The Union initially proposed to add two holidays to the ten existing contractual holidays, and to limit overtime on the days before and after a holiday. The Union later reduced its demands to one additional declared holiday and proposed to abandon its overtime proposal for working on holidays if the Company agreed to make concessions on overtime. The Company rejected the Union's proposal, offering instead to convert four declared holidays to personal days. On August 29, the Company further modified its proposal to require the conversion of only one holiday—the day after Thanksgiving. The Union conditioned acceptance on the Company's agreement to declare an additional holiday (Martin Luther King Day) a personal day. The Company showed no willingness to accept this condition.

**B. Workweek, Workday Schedule.** The Company sought to implement a workweek, workday schedule that would shorten the turn-around time on receiving orders and allow it to deliver merchandise to its members in one day. The expiring agreement provided for a Monday through Friday schedule of five eight-hour days, and for time and one-half on Saturdays and double time on Sundays. The Compa-

ny proposed either a four-day, ten-hour or a five-day, eight-hour week, with Saturdays and Sundays included as part of the regular work week (thus not requiring overtime). *See Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 8. The Union rejected this proposal; it opposed the idea of Saturdays and Sundays as ordinary workdays. On August 28, the Company modified its proposal; the new proposal called for a Sunday to Saturday workweek with either four ten-hour workdays or five eight-hour days; overtime would accrue after four ten-hour days at 1.5 times the base rate for the fifth and sixth days, and double time on the seventh day. The "four tens" and "five eights" shifts would be filled first voluntarily and then by shift in accordance with seniority and ability. In response to the Company's modifications, the Union offered the following proposal: For inbound work (i.e., receiving and stocking merchandise), four ten-hour days or five eight-hour days, with weekend work voluntary; for outbound work, five eight-hour days or four ten-hour days, with weekend work at straight time. The Company responded that it would pay time and one-half beyond eight hours for the five eight-hour days, and beyond ten hours for the four ten-hour days, but refused to pay double time for the sixth day.

**C. Health Care.** The Company proposed that the Union abandon the Teamsters Fund and instead adopt the Company's health plan. The Union proposed to maintain the Teamsters Fund exclusively, with the Company paying the entire amount of cost increases to contributions to the Fund and eliminating employee co-payments. On August 28, the Company modified its offer, proposing inclusion of its plan as an option for employees. If em-

---

**3.** The negotiations took place over a six week period, on July 20 and 21 and August 2, 3, 4, 23, 28, and 29.

ployees chose the Company plan, the Company would pay twenty-five percent of the cost; if employees opted to stay in the Teamsters Fund, the Company would pay a predetermined monthly contribution per employee in the first year, and 75% of the cost of the Company's health plan in the second year. Although the Company later increased this amount, the Union continued to propose higher monthly contributions and elimination of employee copayments.

**D. Wages.** The Company had a two-tier, progressive wage structure: The bottom tier consisted of employees hired after August 27, 1985; the top tier was composed of employees hired before that date. The Union initially proposed a general increase of 75 cents per hour during each year of the contract; a merge of the two tiers by equalizing lower and top tier wage levels over the 3 years of the contract; and inclusion of employees in the Company's 401(k) program. *See Cotter & Co.,* 331 N.L.R.B. No. 94, slip op. at 8. On August 28, the Company proposed a continued two-tier system, with an increase in bottom tier rates of 20 cents in each of the three years of the agreement, and an increase in top tier rates of 20 cents, 10 cents, and 10 cents in each of the three years, respectively. The Union counterproposed a merge of the two tiers over four years; a general wage increase of 65 cents in each year of the agreement; and deferred employee participation in the Company's 401(k) program until the second year of the agreement. The Union also withdrew its earlier proposal for double-time payment for overtime. The Company counteroffered an increase in bottom tier rates of 25 cents, 25 cents, and 20 cents, and in top tier rates of 25 cents, 15 cents, and 10 cents in each year of the agreement. On August 29, the parties again modified their proposals. The Union proposed a top tier wage increase of 60

cents in the first year and 55 cents in the second and third years; a merge of the two tiers over a five-year period; a reduction in shift premium; and deferred employee participation in the Company's 401(k) plan until the third year of the agreement. The Union also abandoned its earlier proposal to limit mandatory overtime. The Company counteroffered with wage increases of 30 cents, 30 cents, and 25 cents for the bottom tier, and 25 cents, 15 cents, and 10 cents for the top tier for the three years of the agreement. In response, the Union proposed maintaining the two-tier system in exchange for wage increases of 60 cents, 70 cents, and 80 cents over three years for the lower tier and 50 cents for each of the three years for the top tier. The Union also abandoned its request for employee participation in 401(k) plans and reduced its shift premium demand to 30 cents per hour, but its wage increase proposals remained over twice what the Company proposed.

In retrospect, the parties present conflicting accounts of the extent of progress in the negotiations, and of the degree to which the parties had exhausted their willingness to make further concessions. The Union points to statements by its spokesman that negotiations had advanced on a number of issues, including holidays, and to a statement by the Union's attorney at the outset of the August 28 session that no impasse existed because both parties had made concessions and there were a "lot of points the Union was willing to move on." *Cotter & Co.,* 331 N.L.R.B. No. 94, slip op. at 8. The Company, on the other hand, points to statements indicating impasse in the key areas of negotiation: (1) a statement on August 4 by a member of the Union's negotiating committee affirming that there was an impasse at least as to holidays; (2) August 23 statements by both the Company and the Union that the

parties were at impasse on a number of "non-economic" issues, including the Company's workweek, workday proposal; and (3) the Union's declaration upon receiving the Final Offer that there was nothing in the Final Offer that it could recommend to unit employees.

On August 29, the Company issued what it termed its "last, best, and final offer." For outbound work, the Company offered a workweek, workday schedule of four ten-hour or five eight-hour days, Monday through Friday, staffed first on a voluntary basis and then on a mandatory basis according to seniority and ability. Overtime in a four-day week would be paid at time and a half on the fifth and sixth days, and double time on the seventh day; overtime for the five-day workweek would be the same as under the expiring agreement. For inbound work, the Final Offer required four ten-hour or five eight-hour days Sunday through Saturday. Overtime for the five-day schedule would be time and one-half for the sixth day and double time on the seventh day. For the four-day week, overtime would be the same as for outbound work. As to health care, the Final Offer included the Company's health plan as an option for unit employees, with monthly contributions by the Company of $252, $260, and $270 over the three years of the agreement. As to wages, the Company presented its "bottom line" proposal: an increase of 30 cents, 30 cents, and 30 cents for the bottom tier, and 25 cents, 15 cents, and 15 cents for the top tier. Prior proposals (other than wages and health care payments) remained unchanged. The Final Offer thus remained substantially similar to the Company's earlier proposals and its third wage proposal of August 29. The Final Offer provided that if the employees ratified the contract by August 31, they would receive an extra 5 cents in their wages for the third year. The Company stated that it intended to implement its Final Offer if it was not approved by August 31.

The Union objected to the Company's conclusion of impasse, stating through its attorney upon receipt of the Company's Final Offer that "no impasses existed and that [the Company] would violate the Act if it implemented the offer." *Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 9. The Union further stated that the Company's Final Offer contained nothing that the Union could recommend to the employees. *See id.* at 1–2. On August 30, the unit employees unanimously voted not to vote on the Final Offer and to strike; however, a strike never took place. On August 31, the Union informed the Company that its Final Offer was "not even dignified with a vote," and requested further meetings to continue bargaining.[4] The Company declined further meetings, stating that the Union had the Company's final offer, and the Union filed an unfair labor practice charge.[5]

On September 6, 1995 the Company implemented its Final Offer, terminating the contractual grievance and arbitration procedure and the automatic deduction of union dues and initiation fees. On September 10, the Union sought to resume negotiations. On September 22, the Company implemented new work rules, and thereafter took disciplinary action

---

4. The record does not indicate that the Union representative notified the Company of the areas in which the Union was willing to grant further concessions.

5. The Union filed a second unfair labor practice charge on March 21, 1996. After the Board consolidated the Union's unfair labor practice charges, the Union filed an amended charge on April 3, 1996. A consolidated complaint was filed on May 30, 1996.

against four employees based, in part, on the new work rules.[6]

Following a hearing, an Administrative Law Judge ("ALJ") found that the Company "did not demonstrate that an impasse existed at the time it stopped bargaining on August 29" because the parties' bargaining sessions "[did] not constitute the type of exhaustive negotiations which might prompt a finding of impasse." *Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 10. The ALJ further found that the Company had unlawfully disciplined and discharged employees pursuant to unlawfully implemented work rules, bypassed the Union in dealing directly with an employee, and refused to process employee grievances. *See id.* at 9–12. The Board affirmed the ALJ's findings that the Company violated § 8(a)(5) and (1) "by refusing to meet and bargain with the Union, by implementing its last offer, including new work rules, in the absence of a valid bargaining impasse, by bypassing the Union and dealing directly with a unit employee,

and by refusing to process employees' grievances." *Id.* at 1.[7]

## II.

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Mandatory areas of collective bargaining include "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d); *see also Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *NLRB v. Katz*, 369 U.S. 736, 742–43, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). An employer violates this duty to bargain if, absent a final agreement or a bargaining impasse, he unilaterally imposes changes in the terms and conditions of employment. *See* 29 U.S.C. § 158(d); *Katz*, 369 U.S. at 742–43, 82 S.Ct. 1107; *Taft Broad. Co.*, 163 N.L.R.B. 475, 478 (1967), *petition for review denied sub nom. American Fed'n of Television & Radio*

**6.** The four employees were Matthew Dillon, Alejandro Gonzalez, Richard Martin, and Adam Csongedi. Dillon received a verbal warning on October 3, 1995, a written warning on November 2, 1995, and a one-week suspension on November 7, 1995, for refusing to work scheduled overtime pursuant to amended Work Rule 5. *See infra* note 11. After he filed a grievance over the suspension, the Company informed Dillon, without the participation of the Union, that the suspension was a mistake and paid him for the time that he had lost. Dillon was subsequently fired for violating the Company's no-fault attendance policy; the ALJ found that this discharge was not improper. *See Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 11. Gonzalez, who was found to have violated amended Work Rule 5, received a verbal warning on October 10, 1995, a third-step suspension on January 2, 1996, and was discharged for subsequent work rule violations on January 12, 1996. Martin received a verbal warning in September 1995, and a written warning in November 1995, for failing to work scheduled

overtime in violation of amended Work Rule 5. In December 1995, Martin was suspended for being out of his work area pursuant to a preimpasse portion of Work Rule 5, and was discharged on February 20, 1996, for again being out of his work area. Csongedi was suspended on March 29, 1996, for violating a quality standard under the expiring agreement; the prior verbal and written warnings that formed the basis of the suspension, however, were issued pursuant to post-impasse quality standards.

**7.** The Board also affirmed the ALJ's finding that the Company's discipline of two employees (Gonzalez and Csongedi) was unlawful because "the [Company's] unlawfully imposed [work] rules were a factor" in those disciplinary actions. *Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 3. The Board reversed the ALJ's conclusion that the Company violated § 8(a)(5) and (1) by refusing to deduct Union dues after expiration of the existing bargaining agreement. *See id.*, at 4.

*Artists v. NLRB*, 395 F.2d 622, 624 (D.C.Cir.1968).

■■■ A bargaining impasse—which justifies an employer's unilateral implementation of new terms and conditions of employment—occurs when "good faith negotiations have exhausted the prospects of concluding an agreement," *Taft*, 163 N.L.R.B. at 478, leading both parties to believe that they are "at the end of their rope." *PRC Recording Co.*, 280 N.L.R.B. at 635; *see also Teamsters Local 639 v. NLRB*, 924 F.2d 1078, 1084 (D.C.Cir.1991); *American Fed'n of Television and Radio Artists*, 395 F.2d at 628. For an impasse to be found, the parties must "have reached 'that point of time in negotiations when [they] are warranted in assuming. that further bargaining would be futile.'" *Wycoff Steel, Inc.*, 303 N.L.R.B. 517, 523 (1991) (quoting *Patrick & Co.*, 248 N.L.R.B. 390, 393 (1980)). Whether the parties have reached this point is a case-specific inquiry; "[t]here is no fixed definition of an impasse or deadlock which can be applied mechanically to all factual situations." *Dallas Gen. Drivers, Warehousemen and Helpers, Local 745 v. NLRB*, 355 F.2d 842, 845 (D.C.Cir.1966). Among the factors that the Board considers in evaluating the existence of an impasse are "the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations." *Taft*, 163 N.L.R.B. at 478. After weighing these factors, the Board will find an impasse if there is "no realistic possibility that continuation of discussions ... would have been fruitful."[8] *American Fed'n of Television and Radio Artists*, 395 F.2d at 628.

The Board concluded that "the parties had not bargained to impasse before the [Company] unilaterally implemented changes in the unit employees' terms and conditions of employment." *Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 1. In so finding, the Board "emphasize[d] that, until the [Company] abruptly claimed that its 'last, best and final offer' was on the table and would be implemented unilaterally if not accepted, both the [Company] and the Union had demonstrated considerable flexibility and willingness to compromise their positions." *Id.* This, the Board observed, was evidenced by the parties' concessions in the immediately preceding bargaining sessions; the Union's statement, upon receiving the Company's final proposal, that the parties were not at impasse; and the Union's subsequent request for additional meetings.[9] *See id.* at 1–2. In the Board's view, these circumstances cast doubt on the Company's characterization of its Au-

---

8. An impasse does not "permanently relieve[] [the parties] of the duty to deal with each other." *NLRB v. McClatchy Newspapers*, 964 F.2d 1153, 1164 (D.C.Cir.1992). As the court observed in *McClatchy Newspapers*, an "impasse is only a temporary deadlock or hiatus in negotiations, 'which in almost all cases is eventually broken, through either a change of mind or the application of economic force.'" *Id.* at 1165 (quoting *Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982) (internal citation omitted)); *see also Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 232 (D.C.Cir. 1996).

9. On appeal, the Board does not rely on the ALJ's findings, which the Company challenges, that the Company (1) rejected "out-of-hand" "virtually all of the Union's proposals" during the first six days of bargaining, (2) proposed language changes that were "radical departures" from the expiring agreement, (3) did not make an economic proposal until the penultimate bargaining session, and (4) did not give the Union information about its work week proposal until later in negotiations. *See id.* at 10.

gust 29 proposal as a "final offer" and indicated that "the parties did not have a contemporaneous understanding that they were at impasse." *Id.* at 2. The Board declined to consider the Union's conduct upon receiving the Company's August 29 proposal—specifically, the Union's statement that the Company was not offering anything that the Union could recommend to its employees—as indicative of the Union's final bargaining position. Rather, the Board characterized the Union's statement as "an understandable expression of dissatisfaction" with the Company's "abrupt declaration that its most recent offer was 'final' and would be implemented unilaterally if rejected." *Id.*

The Company contends on appeal that the Board (and the ALJ) erred in interpreting the Company's good-faith bargaining[10] and consequent concessions immediately preceding its Final Offer as an indication that the Final Offer was not truly final. The Company maintains that the Board ignored the record as a whole, which, in the Company's view, "would tell any experienced negotiator that the parties were at impasse." Br. for Petitioner at 32. The Board, on the other hand, contends that "the parties had made significant progress and demonstrated considerable flexibility on [key issues]," and that "no contemporaneous understanding of impasse by both sides existed, because the Union explicitly denied the existence of impasse and repeatedly requested the continuance of bargaining, which the Company refused." Br. for Respondent at 16.

■ The court has long recognized that "[i]n the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to

the expert experience of a board which deals constantly with such problems." *American Fed'n of Television and Radio Artists*, 395 F.2d at 627 (quoting *Dallas Gen. Drivers*, 355 F.2d at 844–45). Thus, the court ordinarily defers to the Board's fact-finding as to the existence of a bargaining impasse. *See Teamsters Local 639*, 924 F.2d at 1083; *Dallas Gen. Drivers*, 355 F.2d at 844–45. To do so, however, the court must be satisfied that the Board's findings are supported by substantial evidence on the record considered as a whole. *See* 29 U.S.C. § 160(e) (1998); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 233 (D.C.Cir.1996); *Teamsters Local 175 v. NLRB*, 788 F.2d 27, 30 (D.C.Cir. 1986); *American Fed'n of Television and Radio Artists*, 395 F.2d at 627. We hold that the Board's conclusion of no impasse fails to satisfy this standard because the Board's findings that the Company's Final Offer was not truly "final" and that neither party was at the end of its bargaining rope are not supported by substantial evidence.

■ First, nothing in the record negates the Company's classification of its August 29 proposal as its "last, best, and final offer." Indeed, the record demonstrates that the Company, which was facing economic exigencies, bargained in good faith, made substantial concessions, and ultimately reached a point when it was simply unwilling to compromise further. Although merely labeling an offer as "final" is not dispositive, *see Teamsters Local 175*, 788 F.2d at 31; *Chicago Typographical Union v. Chicago Sun–Times*, 935 F.2d 1501, 1508 (7th Cir.1991), the circumstances here are telling. On August 4, the Company advised the Union that when it

---

10. Neither the Board nor the ALJ found that the Company negotiated in bad faith. *See* *Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 1–2, 7–9.

had reached the limits of its bargaining, it would call its final proposal its "last, best, and final" offer. Thus, unlike *Teamsters Local 175* and *Chicago Typographical Union*, where the employer set forth a number of offers, all of which it termed "final," the Company signaled to the Union that it would use this particular language only when it had reached its bargaining limit. Moreover, the Company's demonstrated good faith in bargaining—a *Taft* factor that the Board and the ALJ neglected to apply—leaves no grounds for rejecting the Company's characterization of its August 29 proposal as its Final Offer. The record evidence thus demonstrates that in the face of eight days of what were uniformly perceived as difficult negotiations, the Company engaged in the kind of good-faith, hard bargaining that characterizes impasse. *See Georgia–Pacific Corp.*, 305 N.L.R.B. 112, 121 (1991); *Salinas Valley Ford Sales*, 279 N.L.R.B. 679, 690 (1986); *Seattle-First Nat'l Bank*, 267 N.L.R.B. 897, 898–99 (1983), *rev'd in part on other grounds, Seattle-First Nat'l Bank*, 270 N.L.R.B. 389 (1984).

■■■ The Board's refusal to accept the Company's Final Offer as truly "final" was not based on the record evidence; rather, the Board relied on its intuitive belief that, upon further bargaining, each side would have made additional concessions. The Board stated that "there had been movement on both sides concerning important subjects such as wages, benefits, and holidays, and the parties continued making concessions until the [Company 'abruptly'] cut off that process." *Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 1. This approach, however, is impermissible, for it amounts to an intervention by the Board in the parties' substantive negotiations. In *NLRB v. American National Insurance Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), the Supreme

Court observed that the Act's requirement of good faith bargaining "does not compel either party to agree to a proposal or require the making of a concession." Therefore, the Court held, "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *Id.*; *see also H.K. Porter Co. v. NLRB*, 397 U.S. 99, 103, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). In short, the parties remain in control of their negotiations, and each party, not the Board, determines at what point it ceases to be willing to compromise. *See H.K. Porter Co.*, 397 U.S. at 103–04, 90 S.Ct. 821; *NLRB v. McClatchy Newspapers*, 964 F.2d 1153, 1163 (D.C.Cir.1992). This is especially appropriate where, as here, the negotiations were conducted by experienced participants who were intimately familiar with the intricacies of the bargaining process and whose relationship spanned more than a decade.

■■■ Second, the record does not support the Board's conclusion that "the parties did not have a contemporaneous understanding that they were at impasse." *Cotter & Co.*, 331 N.L.R.B. No. 94, slip op. at 2. *Taft* identifies "the contemporaneous understanding of the parties as to the state of the negotiations" as a "factor[ ] to be considered in deciding whether an impasse in bargaining existed." *Taft Broad. Co.*, 163 N.L.R.B. at 478. "If either negotiating party remains willing to move further toward an agreement, an impasse cannot exist: the parties' perception regarding the progress of the negotiations is of central importance to the Board's impasse inquiry." *Teamsters Local 639*, 924 F.2d at 1084. A "contemporaneous understanding" as to impasse does not, however, require the parties to reach *mutual* agreement "as to the state of the negotiations"; rather, each party must independently,

and in good faith, believe that it is "at the end of [its] rope." *PRC Recording Co.,* 280 N.L.R.B. at 635. An application of this *Taft* criterion, which the Board emphasized, reinforces, rather than negates, the existence of an impasse, because nothing in the record indicates that the Company had not bargained to its fullest capacity. Furthermore, the Union's "conduct" on which the Board relies—the Union's self-serving statement on August 29 that the parties were not at impasse and the Union's vacuous request on August 31 for additional meetings—is insufficient to demonstrate the Union's desire to pursue further negotiations.

Absent conduct demonstrating a willingness to compromise further, a bald statement of disagreement by one party to the negotiations is insufficient to defeat an impasse. A contrary result would render the "contemporaneous understanding" *Taft* factor meaningless. Similarly, a vague request by one party for additional meetings, if unaccompanied by an indication of the areas in which that party foresees future concessions, is equally insufficient to defeat an impasse where the other party has clearly announced that its position is final. Indeed, as the court noted in addressing the breaking of an impasse, "[t]he Board itself has indicated that a party's 'bare assertions of flexibility on open issues and its generalized promises of new proposals [do not clearly establish] any change, much less a substantial change' in that party's negotiation position." *Serramonte,* 86 F.3d at 233 (quoting *Civic Motor Inns,* 300 N.L.R.B. 774, 776 (1990)). Even if in the pre-impasse context the Union does not have to offer "a substantial change" in its position, the Union's immediate and definitive rejection of the Company's Final Offer suggests circumstances not unlike those relied upon by the Board in *Seattle-First National Bank* in concluding that the con-

temporaneous understanding of the parties supported a finding of impasse. *See Seattle–First Nat'l Bank,* 267 N.L.R.B. at 898–99. In addition, the Union declined to submit the Final Offer to a vote of the unit employees. *See Cotter & Co.,* 331 N.L.R.B. No. 94, slip op. at 9. Furthermore, although on notice as a result of the Company's earlier signal about the language it would use to identify its final offer, the Union at no time indicated that it was ready to move on any issue that the parties had discussed. Rather, the parties remained far apart on the issues of exceptional importance—wages, healthcare, holidays, and work week. *See Taft Broad. Co.,* 163 N.L.R.B. at 478. Under the circumstances, the record evidence points to no conduct indicating the Union's belief that further negotiations would be fruitful. *Cf. Serramonte,* 86 F.3d at 233.

The Board distinguished *NLRB v. H & H Pretzel Co.,* 831 F.2d 650 (6th Cir.1987), on the ground that both the Company and the Union had indicated flexibility in the last two days of negotiations and thus were not "similarly committed to maintaining plainly irreconcilable positions." *Cotter & Co.* 331 N.L.R.B. No. 94, slip op. at 2. In *H & H Pretzel,* the employer had made clear to the union that it had to achieve substantial labor cost savings in order to survive. After three bargaining sessions, however, the union continued to insist on wage increases. *See* 831 F.2d at 652, 656. Notwithstanding the brief period of negotiations, the Sixth Circuit affirmed the Board's finding that "the union's expressed willingness to continue talks was a mere token offer" made simply to delay the inevitable imposition of wage reductions. *Id.* at 656–57. This characterization of the union's efforts was reinforced by the fact that "the union was on notice, prior to the last negotiation session, of the company's commitment to cutting labor costs [to address its financial concerns]." *Id.*

In distinguishing *H&H Pretzel,* the Board ignored two marked similarities between the two cases. First, as in *H&H Pretzel,* the Company from the outset put the Union on notice that it sought to address significant concerns about competitiveness and productivity by substantially modifying the parties' bargaining agreement. *See supra* note 2. To this end, the negotiations period was lengthier than usual. As in *H&H Pretzel,* although the parties demonstrated flexibility in bargaining, they remained far apart on significant issues. *See H&H Pretzel,* 831 F.2d at 656–57. Second, as in *H&H Pretzel,* "while the [U]nion sought to continue talks, it did not offer a new proposal or indicate a willingness to compromise further on any specific issue." *Id.* at 656. Although bargaining proposals were exchanged, the Union resisted movement in the Company's direction. On the eighth day of negotiations, for example, the Union was continuing to ask for twice the wage increases that the Company was offering, despite the Company's position that employee inefficiencies did not warrant such increases. *See supra* note 2. Unlike *H&H Pretzel,* the Union refused even to submit the Company's Final Offer to the unit employees for a vote. *See* 831 F.2d at 652.

In view of this record evidence, the Board's focus on the abruptness of the Company's Final Offer, on the Union's surprise upon receiving it, and on possible future concessions by both parties misses the mark. *See Cotter & Co.,* 331 N.L.R.B. No. 94, slip op. at 1–2; *see also Serramonte,* 86 F.3d at 233. The bargaining positions of the parties, as expressed by their experienced negotiators, indicate that the parties were at impasse.[11]

## III.

The Company also challenges the Board's findings on employee discipline and the processing of grievances, and the Board's remedial order. Regarding the implementation of new work rules, the Company contends that the Union waived its right to bargain on work rules when it conceded that, in accord with the expired Agreement, the Company had the authority to implement new rules, and that the Union's sole remedy was to initiate grievance proceedings.[12] *See NLRB v. United States Postal Service,* 8 F.3d 832, 836–37 (D.C.Cir.1993); *Haddon Craftsmen,* 300 N.L.R.B. 789, 790–91 (1990); *Jim Walter Res., Inc.,* 289 N.L.R.B. 1441, 1442 (1988). Thus, the Company contends, because the work rules allowed it to determine the appropriate disciplinary measures for any violation, it lawfully disciplined employees Gonzalez, Martin, and Csongedi. Al-

---

11. Because we reverse the Board's finding that TruServ unlawfully implemented its Final Offer, including the TruServ health insurance plan option for employees, there is no occasion to address TruServ's contention that the Board's remedial order should be modified to provide that TruServ would owe no contributions to the Union's Welfare Fund for employees who had opted into the TruServ plan, or, alternatively, would receive a set off against claims it had paid for such employees.

12. Under the expiring agreement, the Company had the right to implement work rules and quality and productivity standards unilaterally; the Union, in turn, had the right to grieve the reasonableness of the rules through an established grievance and arbitration procedure. On September 22 (after implementing its Final Offer), the Company amended its Work Rule 5 to classify a failure to work overtime as a work rule violation, subject to immediate discipline under the Company's progressive disciplinary system.

though both parties raised before the Board the issue of waiver concerning the implementation of new work rules, the Board failed to address this argument in its decision. Instead, the Board focused on its finding of no impasse and summarily concluded that the absence of an impasse rendered unlawful the Company's modification of work rules and any consequent employee disciplinary action. *See Cotter & Co.,* 331 N.L.R.B. No. 94, slip op. at 2–4. It follows from our holding on impasse that the Company lawfully implemented its Final Offer, including the amended work rules that led to the discipline of the employees. *See Katz,* 369 U.S. at 742–43, 82 S.Ct. 1107; *Taft Broad. Co.,* 163 N.L.R.B. at 478. Therefore, we grant the petition as to the work rules and subsequent disciplinary actions.

Regarding the grievance procedure, the Company concedes that it abandoned the formal procedure established by the Agreement, but maintains that its obligation to process grievances, *see Hilton's Envt'l, Inc.,* 320 N.L.R.B. 437, 454 (1995), was adequately satisfied by "the Company's willingness to discuss grievances at the highest levels rather than rote processing at each lower grievance step." Further, the Company maintains that a grievance form signed by the Union is evidence that the Company did not bypass the Union in settling a grievance with one employee. These contentions are meritless. The Board's finding that the Company acted unlawfully in refusing to process grievances is supported by substantial evidence. Despite the Company's position that its new approach was superior, the Company was not free to replace unilaterally the contractual grievance procedure. *See NLRB v. United Nu-*

*clear Corp.,* 381 F.2d 972, 977–78 (10th Cir.1967); *Hilton's Envt'l, Inc.,* 320 N.L.R.B. at 454. Furthermore, substantial evidence supports the Board's finding that the Company's direct dealings with an employee violated § 8(a)(1) and (5) of the Act. *See Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); *Toledo Typographical Union No. 63 v. NLRB,* 907 F.2d 1220, 1222 (D.C.Cir.1990). That the Union signed the grievance form in question indicates the Union's involvement in the filing of the grievance, not the Union's participation in the resolution of the grievance. The Company's alternative contention for upholding its unilaterally imposed grievance procedure, "no harm, no foul," was not presented to the Board, and hence is not properly before the court. *See* 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665–66, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982); *Alwin Mfg. Co., Inc. v. NLRB,* 192 F.3d 133, 143 (D.C.Cir.1999).

Accordingly, we grant the petition in part and deny the petition in part.